Argued and submitted November 16, 1979,
reversed and remanded February 25, 1980

PRECISION CASTPARTS CORP.,
*Appellant,*

*v.*

JOHNSON & HIGGINS OF OREGON, INC.,
*Respondent.*

(No. A-7612-17887, CA 12768)

607 P2d 763

George M. Galloway, Portland, argued the cause for appellant. With him on the briefs was Rives, Bonyhadi & Smith, Portland.

Elizabeth K. Reeve, Portland, argued the cause for respondent. With her on the brief were Souther, Spaulding, Kinsey, Williamson & Schwabe and Mark H. Wagner, Portland.

Before Buttler, Presiding Judge, and Gillette and Roberts, Judges.

GILLETTE, J.

## GILLETTE, J.

Plaintiff brought suit against its insurance agent, Johnson & Higgins ("defendant") and the insurance underwriter who provided coverage, Argonaut Insurance Company,[1] seeking to recover for damages it suffered because its 1971-1974 Workmen's Compensation insurance policy did not contain provisions consistent with what it alleges it was led to expect by its insurance agent. The complaint alleges a cause of action in two counts, one for negligence and one for breach of contract. The trial court struck the negligence count and allowed the case to go to the jury on the contract theory only. A verdict was returned for the defendant. Plaintiff appeals. We reverse.

Plaintiff retained the services of Johnson & Higgins to investigate and procure Workmen's Compensation insurance for it for the period July 1, 1971, to June 30, 1974. It had previously dealt with the defendant in this area. Defendant made a presentation to plaintiff describing the coverage offered by several carriers. Following this presentation, plaintiff instructed defendant to place plaintiff's Workmen's Compensation insurance with Argonaut.

In its complaint, plaintiff alleged that defendant agreed to procure insurance from Argonaut which would limit any "single loss" to $25,000 for purposes of calculating "retrospective premium" adjustments. "Retrospective premium adjustments" means that, rather than agreeing to a set premium before the insurance goes into effect, the premium is continually readjusted based on plaintiff's actual loss experience. A "single loss" limitation would mean that, when calculating these retrospective premium adjustments, Argonaut would deem no single loss to involve more than $25,000.

This action arose because plaintiff experienced a loss well in excess of $25,000. Argonaut treated the

---

[1] On agreement of all parties the case was dismissed as to Argonaut before it went to the jury.

[741]

loss without regard to any single loss limitation for purposes of calculating the retrospective premium adjustment the plaintiff would have to pay for its insurance. This was consistent with its written insurance policy which did not provide for a single loss limitation in the premium adjustments. What it did provide for was a $25,000 loss limit used in calculating any *dividends* which Argonaut might pay.

The complaint, in material part, reads as follows:

"Johnson & Higgins were negligent in one or more of the following particulars:

"1. It failed to properly evaluate the terms of the insurance coverage offered by Argonaut;

"2. It failed to adequately inform plaintiff of the nature of the insurance coverage being procured;

"3. It failed to warn the plaintiff that the insurance coverage that was procured did not contain a single loss limitation; and

"4. It failed to take adequate precautions to procure insurance with the terms plaintiff had been led to expect would be contained in the policy."

The first two subsections were struck at the pleading stage. The second two and, thus, the entire negligence theory were dismissed after the presentation of evidence. The trial judge's ruling was in the nature of the sustaining of the demurrer. Plaintiff assigns as error the dismissal of each of these allegations and the refusal to give certain related jury instructions.

The first two allegations are essentially duplicated by the last two; no error was committed in striking them at the pleading stage. The question remains as to whether the two remaining specifications state a cause of action for negligence. The trial court apparently struck the two remaining specifications of negligence because it believed that this was solely a contract case with the only significant question being whether or not there was an agreement. We disagree.

An insurance agent who agrees to *procure* insurance for another and fails to do so may be liable for

any damage resulting from his omission. Liability may be based upon a breach of contract or negligence or both. *Joseph Forest Products v. Pratt,* 278 Or 477, 480, 564 P2d 1027 (1977). By promising to procure insurance, the agent incurs a duty to do so. *Monsantofils v. Gacek Ins. Agency,* 282 Or 3, 6, 576 P2d 789 (1978).

Defendant's duty in this case included a duty to warn the plaintiff about the significant distinctions between the alternative insurance policies under consideration. An allegation to the effect that defendant failed to do so is sufficient to state a cause of action in negligence. *See Larson v. Transamerica Life,* 41 Or App 311, 318-19, 597 P2d 1292 (1979), *rev den* 287 Or 301 (1979).

Defendant argues that its negligence, if any, is obviated by plaintiff's failure to read the policy. Plaintiff's failure to read the contract does not excuse defendant. Defendant was the plaintiff's agent in securing the insurance policy. Plaintiff had a right to rely on the superior expertise of its agent and had the right to assume that its agent performed its duty. Thus, contrary to the defendant's contention, the plaintiff had no duty to read the policy. *Franklin v. Western Pac. Ins. Co.,* 243 Or 448, 453, 414 P2d 343 (1966).

Having determined that a cause of action for negligence was made out by the pleadings, we turn now to an examination of the evidence to determine if the negligence theory should have been submitted to the jury.

Plaintiff asked the defendant to conduct a survey on its behalf with the object of securing Workmen's Compensation insurance. Plaintiff's goal, communicated to the defendant, was to procure a policy that would more accurately control its cash flow—a policy where it would pay the premium as it went along rather than in advance. Nothing specifically was said about a loss limitation on the underlying plan.

Craig McCarty, Vice President of the defendant's casualty department, was responsible for the plaintiff's account. He dealt mainly with Carl Vandenberg, the employee of plaintiff who was assigned the task of contacting different insurance brokers and investigating the different insurance policies. The final decision on which policy plaintiff would buy was to be made by Roy Martin, plaintiff's Vice President and Treasurer.

After some preliminary contact, a presentation on the different insurance policies was made by McCarty. There is a dispute as to who, besides Vandenberg & McCarty, was present at this presentation. Written materials had been prepared by McCarty. They included a chart which compared the loss ratio and loss limitation features for one and three year plans for three different insurance companies. The chart, which is at the heart of this dispute, is reproduced in the margin.[2]

---

[2]

PLAN COMPARISON — NET COSTS

ONE YEAR PLANS

| | | | E.B.I. | | THREE YEAR PLANS | |
| Loss Ratio | Argonaut | Industrial | Insured | Self Insured | Argonaut | Industrial |
| --- | --- | --- | --- | --- | --- | --- |
| 0 | 16,936 | 13,949 | 16,320 | 19,634 | 12,551 | 8,583 |
| 10 | 27,050 | 24,679 | 26,945 | 29,069 | 22,668 | 19,313 |
| 20 | 36,662 | 35,410 | 37,655 | 38,504 | 32,277 | 30,042 |
| 30 | 46,275 | 46,141 | 48,450 | 47,939 | 41,889 | 40,772 |
| 40 | 55,888 | 56,871 | 59,995 | 57,374 | 51,500 | 51,680 |
| 50 | 65,500 | 67,601 | 69,955 | 66,809 | 61,112 | 62,230 |
| 60 | 75,113 | 89,062 | 80,580 | 76,244 | 70,724 | 72,959 |
| 70 | 84,725 | 99,856 | 89,250 max | 85,679 | 80,336 | 83,689 |
| 80 | 94,338 | 106,250 max | 89,250 max | 89,250 max | 89,948 | 94,418 |
| 90 | 97,410 max | 106,250 max | 89,250 max | 89,250 max | 92,131 max | 105,147 |
| 100 | 97,410 max | 106,250 max | 89,250 max | 89,250 max | 92,131 max | 106,249 max |
| Loss Limit | 25,000 | None (6,700 per year for 25,000) | 50,000 | 50,000 | 25,000 | None (6,700 per year for 25,000) |

The chart depicts the loss limit for the three companies. It shows whether they have a loss limit, the amount of that limit and the extra cost, if any, to include a loss limit feature as part of the coverage. Although the chart does not so indicate, in the case of two of these companies the chart refers to a loss limit of the type plaintiff says it eventually expected to procure; in Argonaut's case, however, it refers to a loss limit on the dividend. It is conceded that these are different kinds of limits—a difference which would be an important matter for an insured to know about.

Craig McCarty testified that he discussed the advantages and disadvantages of each insurance proposal and went over the chart. He stated that he explained the dividend feature several times to Vandenberg and never said the Argonaut policy had a $25,000 loss limit on the underlying plan. However, he also admitted that there was no discussion of the absence of such a loss limitation feature. In addition, none of the written materials explained the meaning of the loss limit on the chart.

Carl Vandenberg testified that McCarty was the first to raise the idea of a retrospective plan. He stated that McCarty explained the chart at the presentation meeting, comparing the loss ratio of the different proposals. He claimed that McCarty never told him that the loss limit in Argonaut's column referred to a dividend plan and he took the chart to be comparable in all respects, including loss limit. He recalled asking McCarty why Argonaut was providing such a limit without charge while the other underwriters demanded an extra premium for it. He noted this feature in his memo to Mr. Martin in recommending that plaintiff choose Argonaut.

Vandenberg admitted that the policy had beneficial cash flow aspects for plaintiff, the aspect most stressed by Mr. Martin. He also knew that there was a dividend feature in the policy and that there was a chance plaintiff might receive a dividend. He admits not reading the policy.

Martin testified that he had no direct contact with defendant in regard to their survey and presentation of insurance coverage. He relied on the presentation materials, on Vandenberg's memo and discussions with Vandenberg in choosing Argonaut. He testified that he did not read the policy.

Martin concluded from the materials and Vandenberg that the Argonaut policy contained a loss limitation feature that would be used in calculating retrospective premium adjustments. He says he assumed the chart was a comparison in all respects. There were no other written materials submitted to him to indicate otherwise. He testified that the loss limit included in the premium was one factor he relied on in choosing Argonaut.

In reviewing the granting of an involuntary nonsuit "we view the facts in the light most favorable to the plaintiff to determine if there was sufficient evidence to submit the case to the jury." *Radke v. Carpenter,* 281 Or 671, 673, 576 P2d 365 (1978). "No weighing of the evidence or determination of credibility is appropriate." *Thompson v. Industrial Lumber Co.,* 41 Or App 519, 521, 599 P2d 468 (1979).

We hold there is sufficient evidence in this case to permit a jury to find that defendant, in utilizing the chart, knew or should have known that plaintiff would expect an insurance policy procured from Argonaut to contain a $25,000 single loss limitation provision. It follows that the jury could find that defendant was negligent either in failing to explain the misleading portions of the chart or in failing to procure insurance of the kind plaintiff would be led to expect it would receive. The negligence count should have been submitted to the jury. *See James v. Carnation Co.,* 278 Or 65, 69, 562 P2d 1192 (1976).

Defendant contends that the jury resolved the negligence issue when it found that defendant was not liable for breach of contract. We disagree. All the jury found was that no agreement existed to secure an

insurance policy with a loss limit on the underlying plan. That is a different issue than whether it was negligently represented that such a provision would be included in the plan and whether defendant negligently failed to adequately warn plaintiff about the difference in the loss limit terms of the different insurance policies.

Plaintiff also assigns as error the failure to give certain jury instructions. These instructions are related to the issue of negligence. As the case must be retried, we decline to issue an opinion on the content of jury instructions to be given on the retrial.

Reversed and remanded.